UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CAROLYN LYNN, individually and on behalf of all others similarly situated, | ) ) ) ) |
| v. | ) NO. 3-12-1137 ) JUDGE CAMPBELL |
| ARTHUR F. HELF, H. LAMAR COX, MICHAEL R. SAPP, FRANK PEREZ, and TENNESSEE COMMERCE BANCORP., INC., and KRAFTCPAs PLLC, | ) ) ) ) |

MEMORANDUM

Pending before the Court is Defendant KraftCPAs PLLC ("Kraft")'s Motion to Dismiss for

Failure to State a Claim (Docket No. 65), to which Plaintiffs have filed a Response in opposition

(Docket No. 75). For the reasons stated herein, Kraft's motion is GRANTED.

BACKGROUND

I.      Overview

This case concerns the circumstances leading to the failure of Tennessee Commerce Bank

(the "Bank") on January 27, 2012. Plaintiffs Carolyn Lynn and Grand Slam Master Capital Fund

Ltd. ("Plaintiffs") seek to represent a putative class of plaintiffs who purchased common stock in the

Bank's parent holding company, the Tennessee Commerce Bancorp, Inc. ("TNCC"), between April

18, 2008, and January 27, 2012 (the "Class Period"). On September 30, 2013, Plaintiffs filed a

Second Amended Class Action Complaint ("SAC"), which asserts claims against TNCC, several

former officers of TNCC (the "Individual Defendants"), and Kraft, which served as TNCC's and the

Bank's independent outside auditor during the Class Period. With respect to Kraft, Plaintiffs assert

a single count under § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78a *et seq*, and 17 C.F.R. § 240.10b-5 ("Rule 10b-5") promulgated thereunder. Kraft has moved to dismiss this claim for failure to state a claim.[1]

II.    Background Facts[2]

   A.    TNCC and the Bank

TNCC, which is headquartered in Franklin, Tennessee, acted as the holding company for the Bank. The Bank offered retail and commercial banking services to small- and medium-sized businesses in the Nashville area. Kraft acted as TNCC's independent external auditor from 2006 through the Bank's closure in January 2012.

According to the SAC, from about 2007 forward, TNCC systemically disregarded its own loan underwriting policies and guidelines, failed to implement sufficient "internal controls" to monitor and evaluate the Bank's loan portfolio for degradation in loan quality and credit risk, and disregarded regulations and laws concerning the recognition and mitigation of losses.

Notwithstanding the economic downturn that began in 2008, the Bank continued to issue increasingly risky loans in sectors of the economy that were impacted severely by the recession

---

[1]    Plaintiffs have notified the Court that they have reached a settlement in principle with the remaining Defendants. (Docket No. 86.) Those settling Defendants had originally filed a separate Motion to Dismiss (Docket No. 69), which the prospective settlement has rendered moot. The Court therefore addresses only the separate Motion to Dismiss by Kraft, which is not a party to the prospective settlement.

[2]    Unless otherwise noted, the facts are drawn from Plaintiffs' allegations in the SAC, documents incorporated by reference therein, and public filings related to TNCC and the Bank, over which the Court takes judicial notice. *See Tellabs, Inc. v. Maker Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007); *Boyee v. Coopers & Lybrand C.PA.*, 272 F.3d 356 (6th Cir. 2001) (courts "may consider the full text of the SEC filings, prospectus, analysts' reports and statements integral to the complaint, even if not attached, without converting the motion into one for summary judgment"). The Court will limit its discussion to the facts most pertinent to Kraft.

(construction and development, commercial real estate, and manufacturing, among others). Many of these loans were essentially uncollectible. By 2008, TNCC's concentration of commercial and industrial ("C&I") loans had reached 539% of total capital, while responsible peer entities were limiting their C&I portfolio to about 100% of total capital. To make matters worse, during the Class Period, the Bank originated more than $400 million in additional loans, growing its portfolio by about 40%, even as responsible peers were restraining their lending.

Even as the Bank continued to issue risky loans and failed to implement necessary internal controls, TNCC and the Individual Defendants reassured investors that the Bank's financial situation was actually improving (when in fact the opposite was true) and misrepresented the quality of its loan portfolio to investors. As discussed herein, an accounting term called the "allowance for lean and lease losses" (the "ALLL") approximates the portion of a lender's total loan portfolio that is impaired or otherwise not likely to be collected in the future. Discounting the present value of a loan portfolio by the ALLL provides a more accurate representation of a company's present financial status.[3] Here, Plaintiffs allege that, from 2009 through 2012, the Bank intentionally understated its

---

[3]     In more technical terms, the ALLL acts as an accrued charge against a bank's income. Various Generally Accepted Accounting Principles ("GAAP") govern the calculation of the ALLL, most importantly FAS 5 and FAS 114. FAS 5 governs the collective evaluation of an entity's loan portfolio for impairment. It requires that loss contingencies be reported as a charge to income where (1) information available makes it probable that an asset has been impaired or a liability had been incurred at the date of the financial statements; and (2) the amount of loss can be reasonably estimated. FAS 114 concerns the evaluation of individual loans for impairment. Under FAS 114, a loan is impaired when, "based on current information or events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement." It "does not specify how a creditor should determine that it is probable that payment of a loan will be collected as scheduled," but directs that "[a] creditor should apply its normal loan review procedures in making that judgment." According to the FDIC, "[t]he  ALLL represents one of the most significant estimates in an institution's financial statements and regulatory reports." FDIC Law, Regulations, Related Acts § 5000 - Statements of Policy, FDIC (Feb. 28, 2013), *available at* http://www.fdic.gov/regulations/laws/rules/5000-4700.html.

ALLL each year to disguise the Bank's actual worth and its increasingly dire financial prospects. As regulators later determined, by January 2012, when the Bank failed, more than 40% of the Bank's $1.0 billion in outstanding loans were uncollectible. In other words, at least as of the time the Bank failed, the ALLL was actually about $420 million, whereas the company had reported ALLL in August 2011 of just over $28 million.

During the Class Period, Kraft served as the external auditor for the Bank.

B.      Alleged "Red Flags" of Financial Impropriety

Plaintiffs allege that Kraft failed to comply with GAAS when it stated, in its audit letters, that TNCC's financial statements complied with GAAP and were free of material misstatement. Plaintiffs allege that Kraft ignored numerous "red flags" of potential financial impropriety by TNCC and its officers. In particular, during the Class Period, the Federal Deposit Insurance Corporation ("FDIC") provided ongoing supervisory oversight of the Bank in compliance with federally mandated oversight requirements, in the course of which it identified potential problems at TNCC and the Bank.[4] Based on materials in the record, relevant events include the following incidents:

- 2007: In July 2007, three members of TNCC's Board of Directors (the "Board") resign as a result of their disagreement with the Board's decisions concerning executive compensation. The FDIC does not take any action.

- March-July 2008: In an April 2008 review, the FDIC notes an increase in the Bank's repossessed assets, some of which may have been held more than six months in violation of Tennessee law. The FDIC determines that the Board's

---

[4]      The record contains a "Material Loss Review" ("MLR") prepared for the FDIC following the Bank's failure. To the extent the Material Loss Review describes events, regulatory oversight, and enforcement activities of which Kraft was actually or constructively aware, the Court summarizes that information herein. As described in the MLR, the FDIC coordinated its oversight and enforcement activities with the Tennessee Department of Financial Institutions ("TDFI"). For the sake of linguistic simplicity only, the court will generally refer to these entities collectively as the FDIC.

Asset/Liability Committee ("ALCO")) has not been meeting on a regular basis and submitted false "minutes" to the Board, perhaps in violation of Tennessee criminal law. The FDIC also observes that the Bank's external audit (prepared by Kraft) contains two "material weaknesses" relating to the failure to follow policies relating to employee accounts and the failure of the asset liability committee to hold meetings. Notwithstanding these issues, the FDIC gives the Bank an overall satisfactory rating. In April 2008, Kraft issues an unqualified audit letter concerning the Bank's financial statements.

In April 2008, the FDIC performs a visitation to investigate allegations by the Bank's terminated CFO, George Fort, that the company had condoned or ignored misconduct by the Bank's employees and that the Bank had made inaccurate financial statements. Following the visitation, the FDIC declines to undertake formal supervisory action. The FDIC also determines that management has taken appropriate steps to correct the "weaknesses" identified in the 2007 external audit.

Nevertheless, Fort sues the Bank and TNCC in July 2008 for retaliatory discharge and breach of his employment contract. *See Fort v. Tenn. Commerce Bancorp, Inc.*, Case No. 3:08-0668 (M.D. Tenn. July 9, 2008). In his lawsuit, Fort alleges that he raised concerns about the Bank's internal controls in 2007 and early 2008, including a February 2008 presentation to TNCC's Audit Committee disclosing that the Board's ALCO had been inactive and that members of the committee had been furnishing fraudulent meeting minutes to the Board and external auditors. Fort alleges that he informed TNCC in early March 2008 that he intended to speak with the FDIC immediately about his concerns, that he in fact spoke with the FDIC on March 6, 2008, and that he was terminated by the company on March 7, 2008 – allegedly in retaliation for speaking to the FDIC. The docket reflects that the parties settled the case and stipulated to its voluntary dismissal in October 2010, without any merits-based rulings from the court.

- June 2009 Examination: After a June 2009 examination, the FDIC downgrades the Bank's composite rating and concludes that it is in "troubled condition." At the time, the FDIC notes that the economic downturn caused liquidity issues, that some evidence of lax underwriting and administration is present at the Bank, that it would be prudent for TNCC to reassess its risk appetite, and that the Bank's loan portfolio is highly sensitive to economic conditions.

- January and February 2010: As a means of informal corrective action following the June 2009 review, the FDIC provides to the Board a proposed "Memorandum of Understanding" ("MOU") in January 2010. The MOU

would require the board to, *inter alia*, develop a written plan to reduce its level of nonperforming assets, restrict advances to certain borrowers, and restrict asset growth. The Board pushes back: in February 2010, it asks the FDIC to consider the Board's earlier October 2009 Bank Board Resolution ("BBR") as a sufficient response to address the findings of the June 2009 examination.

- April 2010: The FDIC performs a follow-up examination to assess the Board's compliance with the proposed, but unsigned, January 2010 MOU. On April 15, 2010, Kraft issues an unqualified audit letter in connection with the Bank's 2009 10-K filing, but notes that it was retained only to perform a financial statement audit, not a complete audit.[5]

- June 2010: The FDIC rejects the Board's proposal to treat the BBR as an appropriate response to the MOU. The FDIC informs the Board that the MOU reflects the most appropriate course of action. The Board does not sign the proposed MOU.

- August 2010: The FDIC conducts an examination. The FDIC determines that the Bank's condition has deteriorated further: it concludes that earnings are insufficient to support operations, that liquidity is deficient, that the Bank continues to engage in lax lending practices with insufficient oversight or consideration of the potential consequences, and that management has not been recognizing losses in a timely manner, resulting in incorrect financial reports. Notably, the FDIC's final examination report does not issue until March 17, 2011.

- February and March 2011: Based on the serious financial and managerial deficiencies identified in its August 2010 examination, the FDIC notifies the Board in February 2011 that it intends to pursue formal enforcement action.

  On March 17, 2011, the FDIC provides its final August 2010 examination report to the Board. The report includes, *inter alia*, recommendations that the Bank (1) revise ALLL by $16.3 million, and (2) implement an ALLL calculation that complies with FAS 114 and FAS 5 methodology. On March 24, 2011 (one week later), the Board responds by challenging the FDIC's examination as significantly flawed, announcing that TNCC intends to appeal the results of the examination.

---

[5]     The Court discusses the content of Kraft's 2009 and 2010 audit letters in a separate section of this opinion.

- April and May 2011: On April 6, 2011, the FDIC informs the Board that it cannot appeal the grounds for the proposed enforcement action. On April 18, 2011, TNCC files its Form 10-K, which includes financial statements for fiscal year 2010. TNCC acknowledges the pending dispute with the FDIC concerning TNCC's calculation of "loan and loss impairment," but TNCC states that the FDIC report of examination contains "various inaccuracies," that TNCC "do[es] not concur" with the FDIC's preliminary recommendation to adjust ALLL by $16 million, and that TNCC intends to "vigorously appeal" the "various inaccuracies contained in the report of examination." In connection with TNCC's 2010 10-K, Kraft issues a qualified audit letter, stating that it was retained only to perform a financial statement audit and that it "cannot satisfy" itself concerning the ALLL, in light of the pending regulatory inquiries.

  On May 25, 2011, the Board stipulates to the proposed order (the "Consent Order"). With respect to the ALLL, the Consent Order requires the Board to implement a reliable ALLL methodology going forward, but it does not require any adjustment to the 2010 ALLL.

- June 2011: On June 1, 2011, Kraft issues an supplemental unqualified audit letter concerning the Bank's 2010 financial statements, again disclosing that it was engaged only to perform a financial statement audit.

- September 2011: The FDIC conducts an examination to assess the Board's compliance with the Consent Order. The FDIC does not issue a final report before the Bank's closure.[6] The FDIC orders the Bank to increase its ALLL by approximately $83 million.

- November 2011: On November 1, 2011, the Bank issues a Restatement, stating that it will be revising its financial results for the second quarter of fiscal year 2011 ended June 30, 2011, to reflect an $83 million increase in the ALLL. The increased ALLL thereby decreases the Bank's capitalization to unacceptable levels.

- January 2012: On January 20, 2012, the Bank files a Form 8-K/A with the SEC which includes a letter from Kraft stating that Kraft is withdrawing its

---

[6]    The MRL states that, following the September 2011 review, the FDIC preliminarily determined that the Bank was critically underfunded and that near-time failure was highly probable. According to the MRL, the FDIC had observed continuing lending limit violations, lax lending practices, poor credit administration and loan monitoring practices, and a severely deficient classification of the ALLL. It is not clear from the MRL or the record precisely when these preliminary findings were communicated to the Board.

2010 audit letter and is investigating whether it will also withdraw audit letters corresponding to other previous financial statements by the Bank.

Unable to raise sufficient capital, the Bank is closed by the TDFI on January 27, 2012 and the FDIC is appointed as receiver.

C.      Allegations Relating to Kraft

Plaintiffs allege that Kraft should be held liable for securities fraud because it failed to probe the reliability of the Bank's financial statements in the face of increasing "red flags" of likely financial impropriety. Plaintiffs' allegations and brief (as they relate to Kraft) take a "kitchen sink" approach, making it somewhat difficult to follow which statements Plaintiffs believe that Kraft should have amended, when, and in what manner. As best the Court can discern, Plaintiffs believe that Kraft should have realized at least by mid-2011 that TNCC had misstated the ALLL in its 2010 10-K and in the 10-K forms for previous years. The actual allegations of conduct by Kraft are sparse. In relevant part, Kraft performed a full audit relative to the 2007 and 2008 financials for the Bank, but it did not conduct an internal controls audit for fiscal years 2009 and 2010. The Bank failed in January 2012, well before TNCC's 2011 financial statements were due.

1.      2009 Audit Letter

In connection with TNCC's 2009 10-K filing, Kraft provided the following audit letter:

We have audited the accompanying consolidated balance sheets of Tennessee Commerce Bancorp, Inc. and subsidiaries (collectively, the "Company") as of December 31, 2009 and 2008, and the related consolidated statements of income, changes in shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2009. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial

8

statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Tennessee Commerce Bancorp, Inc. and subsidiaries as of December 31, 2009 and 2008, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2009, in conformity with U.S. generally accepted accounting principles.

*We were not engaged to examine management's assessment of the effectiveness of Tennessee Commerce Bancorp, Inc.'s internal control over financial reporting* as of December 31, 2009, in accordance with the standards of the Public Company Accounting Oversight Board, included in the accompanying Management's Report on Internal Control Over Financial Reporting and, *accordingly, we do not express an opinion thereon.*

2009 10-K at F-3 (emphases added).

Furthermore, in a section of the 10-K drafted and attested to by management, TNCC states:

*Management,* with the participation of the Corporation's Chief Executive Officer and Chief Financial Officer, *conducted an assessment of the effectiveness of the Corporation's system of internal control over financial reporting* as of December 31, 2009, based on criteria for effective internal control over financial reporting described in "Internal Control - Integrated Framework," issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, *management* believes that the Corporation maintained effective internal control over financial reporting as of December 31, 2009.

This annual report *does not include an attestation report of the company's registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by the Company's registered public accounting firm* pursuant to temporary rules of the Securities and Exchange Commission that permit the Company to provide only management's report in this annual report.

*Id.* at F-2 (emphases added).

2.      2010 Audit Letters and January 2012 Withdrawal Thereof

In the 2010 10-K, filed on April 18, 2011, TNCC included the same disclaimer as the 2009 report, to the effect that the annual report "does not include an attestation report" by Kraft and that TNCC's management, based on its own assessment, "believes that the Corporation maintained effective internal control over financial reporting as of December 31, 2010." However, in contrast to Kraft's 2009 Audit Letter, Kraft issued a *qualified* audit letter in connection with the 2010 fiscal year financial report (the "2010 Audit Letter"). The letter states as follows:

> We have audited the accompanying consolidated balance sheets of Tennessee Commerce Bancorp, Inc. and subsidiaries (collectively, the "Company") as of December 31, 2010 and 2009, and the related consolidated statements of income, changes in shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2010. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

> *Due to an unresolved report of examination from the Federal Deposit Insurance Corporation and Tennessee Department of Financial Institutions that could require adjustments to the allowance for loan losses as discussed in Note 12, we were unable to satisfy ourselves about the valuation of the Company's allowance for loan losses as of December 31, 2010.*

> In our opinion, except for the effects of such adjustments, if any, as might be determined necessary based on the outcome of the regulatory examination discussed in Note 12, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Tennessee Commerce Bancorp, Inc. and subsidiaries as of December 31, 2010 and 2009, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2010, in conformity with U.S. generally accepted accounting principles.

> *We were not engaged to examine management's assessment of the effectiveness of Tennessee Commerce Bancorp, Inc.'s internal control over financial reporting* as of December 31, 2010, in accordance with the standards of the Public Company Accounting Oversight Board, included in the accompanying Management's Report on Internal Control Over Financial Reporting and, *accordingly, we do not express an opinion thereon.*

2010 10-K at F-3 (emphases added).

Note 12 to the 10-K, which Kraft's 2010 Audit Letter references, describes the August 2010 FDIC examination and the FDIC's March 17, 2011 report concerning that examination. Note 12 discloses, among other things, that the FDIC had deemed the Bank to be in "troubled condition," that the FDIC would be pursuing formal enforcement action, and that the results of the enforcement action could include requirements that the Bank increase its capital ratios, improve asset quality, improve liquidity, address potential regulatory violations, and increase the level of loan and lease loss allowance. (2010 10-K at F-30 to F-31.) Furthermore, Note 12 (prepared by TNCC) states as follows:

> Moreover, as a result of certain criticisms, primarily of our allowance for loan and lease losses, the FDIC and TDFI have advised the Bank that its periodic reports to the regulators for the quarters ended December 31, 2009, March 31, 2010 and June 30, 2010 (periods included in these financial statements) should be restated. Although the FDIC and TDFI focused on these three reporting periods in the examination, we anticipate that any restatement could also include financial statements for the period ending September 30, 2010. Restatement of the Bank's regulatory periodic reports likely will result in the restatement of the Corporation's financial statements for the quarters ended December 31, 2009, March 31, 2010 and June 30, 2010, and if the changes made are material on an annual basis, for the years ended December 31, 2009 and 2010. *We strongly disagree with many of the findings in the report of examination, especially the factors giving rise to the need to restate our prior financial statements*, *primarily due to differences in our loan and lease loss impairment analysis*. However, the changes that may be made in the restatements may be material in the quarter made and may be material to the full year period in which the quarterly results are included. FDIC and TDFI have proposed an increase in our allowance for loan and lease losses of up to approximately $16 million, an amount not recognized in these financial statements. *We do not concur with this*

*amount and our regulators have not provided us with their methodology.* Accordingly, if ultimately required, the increase to our allowance for loan and lease losses may differ from the amount our regulators are requiring. In accordance with established procedures of the FDIC and TDFI *we plan to vigorously appeal what we perceive to be the various inaccuracies contained in the report of examination*, including the required impairment charges. While we have 60-days [sic] to file an appeal after the receipt of a material supervisory determination, we cannot predict the timing of a final regulatory determination or whether we will prevail.

*Id.* (emphasis added).

On May 24, 2011, TNCC signed the Consent Order, which was effective May 25, 2011. In most relevant part, the Consent Order contains a section related to "Allowance for Loan and Lease Losses." In full, that section states as follows:

(a) Within 30 days after the effective date of this ORDER, the Bank shall maintain an adequate ALLL. The ALLL should be funded and calculated in accordance with generally accepted accounting standards and ALLL supervisory guidance. Prior to the end of each calendar quarter, the Bank's Board shall review the adequacy of the Bank's ALLL. Such reviews shall include, at a minimum, the Bank's loan loss experience, an estimate of potential loss exposure in the portfolio, trends of delinquent and nonaccrual loans and prevailing and prospective economic conditions. The minutes of the Bank's Board meetings at which such reviews are undertaken shall include complete details of the reviews and resulting recommended increases in the ALLL.

(b) The Bank must use Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Numbers 450 and 310 (formerly Statements Numbers 5 and 114 respectively) for determining the Bank's ALLL reserve adequacy. Provisions for loan losses must be based on the inherent risk in the Bank's portfolio. The directorate must document with reasons any decision to require provisions for loan losses in the Board's minutes.

Consent Order ¶ 7.

On June 1, 2011, TNCC filed a Form 10-K/A, in which it disclosed that it had entered into the Consent Order. With respect to the Consent Order, TNCC states as follows:

Effective as of May 2011, [the Bank] became subject to a Consent Order (the "Consent Order") with the [FDIC]. The Bank's entry into the Consent Order with the FDIC ended a period of regulatory uncertainty concerning the adequacy of the Bank's allowance for loan and lease losses ("ALLL") following a joint examination of the Bank conducted by the FDIC and the [TDFI] in August 2010. The Consent Order does not require any specific increase in the Bank's ALLL and no restatement of the Bank's or the Company's financial statements is required. Accordingly, the Bank will not be required to restate its ALLL for prior financial reporting periods and the Bank's auditors have issued an unqualified Report of Independent Registered Public Accounting Firm with respect to the Company's audited financial statements for the fiscal year ended December 31, 2010 included this Annual Report on Form 10-K for the period ended December 31, 2010.

2010 Form 10-K/A, revised and filed June 1, 2011.

Note 12 to the revised financial statement includes additional detail concerning the Consent Order. It reiterates that the Consent Order "ended a period of regulatory uncertainty concerning the adequacy of the Bank's ALLL following a joint examination of the Bank conducted by the FDIC and the TDFI in August 2010," and that the Consent Order "does not require any specific increase in the Bank's ALLL and no restatements of the Bank's or Company's financial statements is required." The note also contains bullet points outlining the terms of the Consent Order, including the requirement that "[t]he Bank must maintain an adequate ALLL that is consistent with generally accepted accounting principles and supervisory guidance" and that "the Bank's Board is required to review the adequacy of the Bank's ALLL." The revised 2010 10-K included an unqualified audit letter from Kraft, which states as follows:

We have audited the accompanying consolidated balance sheets of Tennessee Commerce Bancorp, Inc. and subsidiaries (collectively, the "Company") as of December 31, 2010 and 2009, and the related consolidated statements of income, changes in shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2010. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

13

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our report dated April 15, 2011, we expressed an opinion that, except for an uncertainty related to the adequacy of the Company's allowance for loan losses resulting from an unfinished regulatory examination, the 2010 consolidated financial statements presented fairly, in all material respects, the Company's financial position, results of operations, and cash flows in conformity with accounting principles generally accepted in the United States of America. *As described in Note 12 to the financial statements, the Company has agreed to a formal Consent Order (the "Order") with the [FDIC] that eliminates uncertainties unrelated to potential adjustments to the Company's allowance for loan losses.* Accordingly, our present opinion on the 2010 financial statements, as presented herein, is different from that expressed in our previous report.

*In our opinion, the consolidated financial statements referred to above, as restated by the amendment of Note 12 to the financial statements, present fairly, in all material respects, the financial position of [the Bank] as of December 31, 2010 and 2009, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2010, in conformity with accounting principles generally accepted in the United States of America.*

2010 Revised Audit Letter, filed June 1, 2011 (emphases added).

In June 1, 2011, concurrent with filing its revised 2010 10-K, TNCC filed a revised 2010 8-K, which attached a full copy of the Consent Order. (*See* 8-K/A, Ex-10.1.)

In or soon after September 2011, months after Kraft had issued its revised audit letter relative to fiscal year 2010, the FDIC ordered the Bank to restate its all ALLL by about $83 million. On November 1, 2011, the Bank filed a Form 8-K, in which it disclosed that the Bank's quarterly statement for the quarter ending June 30, 2011 "should no longer be relied upon" because TNCC expected to increase its stated ALLL by approximately $83 million as a result of the ongoing FDIC

investigation. TNCC disclosed that the adjustments would cause the Bank to be critically undercapitalized. TNCC also disclosed that management had concluded that TNCC disclosure controls and procedures and internal control over financial reporting were not in fact effective as of June 30, 2011. Docket No. 70, Ex. 9, Form 8-K, Item 4.02.

On January 20, 2012, the Bank filed another Form 8-K, in which it disclosed that TNCC had identified issues that would likely impact previous financial statements. TNCC stated that it was conducting a forensic review and that previous financial statements should "not be relied upon at this time." In most pertinent part, TNCC stated as follows:

> *The Corporation notified Kraft CPAs PLLC, its independent registered public accounting firm, about these developments.* As a result, on January 17, 2012, the Corporation's independent registered public accounting firm advised us that it is withdrawing its previously issued audit opinion related to the financial statements as of December 31, 2010 and related information. Kraft CPAs PLLC further advised us that it is likely that its audit opinions on previous year's financial statements will impacted, but that definitive information is not yet available. Accordingly, Kraft CPAs LLC may withdraw its audit opinions on undeterminable previous year's financial statements. We will amend this Current Report on Form 8-K if and when Kraft CPAs PLLC advises that additional audit opinions have been impacted.

Form 8-K, Item 4.02 (filed January 20, 2012) (emphasis added).

On January 25, 2012, TNCC filed a copy of a January 23, 2012 letter from Kraft concerning Kraft's previous audit statements. In the letter, Kraft states:

> We have read the statements under Item 4.02 of the Current Report on Form 8-K filed with the Securities and Exchange Commission on January 20, 2012 regarding withdrawal of our audit report on [TNCC's'] financial statements as of December 31, 2010 and for the year then ended and the possibility that we may withdraw earlier audit reports pursuant to the results of a forensic of [TNCC's] small ticket loan portfolio. We agree with these statements pertaining to our firm.

Form 8-K/A, Ex. 99.1, filed January 25, 2012. Two days later, TDFI closed the Bank and appointed the FDIC as receiver. *See* Form 8-K, filed January 30, 2012.

3.      Access, Knowledge, Motive

The SAC alleges that the Individual Defendants deceived investors and the public in order to line their own pockets through significant salaries and bonuses, excessive perks, and stock options, even as they were driving the company into the ground.

By contrast, Plaintiffs do not allege any motive for Kraft's alleged failure to heed "red flags" of potentially fraudulent activity, nor is a motive self-evident in the SAC.  Plaintiffs make no specific allegations concerning Kraft's access to information about TNCC and the Bank or that Kraft actually knew about the inner workings of the TNCC and the Bank. Plaintiffs do not allege that Kraft actually knew that TNCC or the Bank had engaged in financial impropriety or that any "whistleblowers" provided Kraft with information that fraud might be occurring at TNCC or the Bank.

D.      Kraft's Motion

Kraft has moved to dismiss the single count against it, contending that Plaintiffs have not met the exacting standard required to a state a claim of securities fraud against an outside auditor.  Kraft primarily argues that Plaintiffs' allegations are insufficient to establish the high degree of scienter required to support a securities fraud claim.  Kraft also argues that Plaintiffs have failed to plead loss causation against it.  In response, Plaintiffs argue that Kraft ignored a litany of "red flags" that should have placed Kraft on notice that the financial statements contained false information, particularly that TNCC was materially and consistently understating ALLL in the years before the Bank collapsed. Plaintiffs also argue that their allegations against "the defendants" (without distinguishing Kraft) are sufficient to plead loss causation generally.  Kraft did not file a Reply.[7]

_____

[7]      TNCC and the Individual Defendants jointly filed a Rule 12(b)(6) motion (Docket No. 69).  The plaintiffs filed a joint opposition brief that addressed both that motion and Kraft's separate Motion to Dismiss.  The plaintiffs' brief contains a section specifically addressing

ANALYSIS

## I.  Legal Standard

### A.  Securities Fraud Under the Private Securities Litigation Reform Act ("PSLRA")

Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder prohibit "fraudulent, material misstatements or omissions in connection with the sale or purchase of a security." *La. Sch. Bd. Employees' Retirement Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 478 (6th Cir. 2010).  To state a securities fraud claim under § 10(b), a plaintiff "must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." *Id.* (internal citations and quotation omitted).  Scienter is a mental state embracing intent to deceive, manipulate, or defraud.  *Id.* (citing *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004)).

Securities fraud claims under § 10(b) must satisfy the pleading requirements of Fed. R. Civ. P. 9(b).  *Ernst & Young.*, 622 F.3d at 478.  Thus, a plaintiff's complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.*

_____

Kraft's contention that Plaintiffs have failed to plead adequate allegations of scienter by Kraft. Plaintiffs' opposition brief also argues that the SAC "sufficiently pleads loss causation" against "the defendants," but that section does not draw any distinctions specific to (nor does it otherwise reference) Kraft.

In response to Plaintiffs' combined opposition brief, Individual Defendants Perez, Sapp, and TNCC filed a Reply (Docket No. 81), Individual Defendant Cox filed his own Reply (Docket No. 82), and Individual Defendant Helf filed his own Reply (Docket No. 83).  Understandably, none of these reply briefs directly addresses Plaintiffs' opposition brief as it relates to Kraft, although (collectively) they do discuss loss causation as it relates to TNCC and each Individual Defendant.

In addition to the underlying substantive and procedural requirements, the PSLRA imposes additional and more exacting pleading requirements in a securities fraud case. *Id.* The Supreme Court has created a three-part test for assessing the sufficiency of a plaintiff's scienter allegations: (1) a court must accept all factual allegations in the complaint as true; (2) a court must consider the complaint in its entirety and decide whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard; and (3) assuming that the plaintiff's allegations create a powerful or cogent inference of scienter, a court must compare this inference with other competing possibilities, allowing the complaint to go forward only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged. *In re: Omnicare, Inc. Securities Litigation*, __ F.3d __, 2014 WL 5066826 (6th Cir. Oct. 10, 2014) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007)).

Under the PSLRA's heightened pleading requirements, any private securities complaint alleging that the defendant made a false or misleading statement must: (1) specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed; and (2) state with particularly facts giving rise to a "strong inference" that the defendant acted with the required state of mind. 622 F.3d at 478 (citing 15 U.S.C. § 78u-4(b)(1), (2)). "The PSLRA 'requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud.'" *Id.* (quoting *Tellabs, Inc, v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)). Congress adopted a "strong inference" standard in order

to "raise the bar for pleading scienter," *Ernst & Young.*, 622 F.3d at 478 (citing *Tellabs*, 551 U.S. at 323-24) (emphasis added), although it left the state of mind required to prove the claim intact. *Ernst & Young*, 622 F.3d at 478.

In general, liability for securities fraud must be premised on at least "reckless" behavior. *Id.* The Sixth Circuit explains the recklessness pleading standard as follows:

> Under the PSLRA, a plaintiff may plead scienter in a securities fraud complaint by alleging facts that give rise to a strong inference of recklessness. Recklessness sufficient to satisfy 10b-5 is a mental state apart from negligence and akin to conscious disregard. It is highly unreasonable conduct which is an extreme departure from the standard of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it. A plaintiff may survive a motion to dismiss only by pleading with particularity facts that give rise to a strong inference that the defendant acted with knowledge or conscious disregard of the fraud being committed.

*Ernst & Young*, 622 F.3d at 478-79.

B.      Securities Fraud Claims Against an Outside Auditor

On top of the exacting baseline statutory pleading requirements, "[t]he standard of recklessness is especially stringent when the defendant is an outside auditor." *Id.* (citing *PR Diamonds*, 364 F.3d at 693); *see also Ley v. Visteon Corp.*, 543 F.3d 801, 814-15 (6th Cir. 2008); *Fidel v. Farley*, 392 F.3d 220, 227 (6th Cir. 2004), *overruled on other grounds*, *Tellabs*, 551 U.S. 308 (2007).

> Recklessness requires a mental state so culpable that it approximates an actual intent to aid in the fraud being perpetrated by the audited company. Scienter requires more than a misapplication of accounting principles. The plaintiff must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts. To allege that an independent accountant or auditor acted with scienter, the complaint must identify specific, highly suspicious facts and circumstances available to the auditor

at the time of the audit and allege that these facts were ignored, either deliberately or recklessly.

*Ernst & Young*, 622 F.3d at 479 (internal quotations, citations, and brackets omitted); *accord PR Diamonds*, 364 F.3d at 693-94 ("When the standard of recklessness for auditor is overlaid with the pleading requirements of the PSLRA, a simple rule emerges: to allege that an independent accountant or auditor acted with scienter, the complaint must allege specific, highly suspicious facts and circumstances available to the auditor at the time of the audit and allege that these facts were ignored, either deliberately or recklessly.") (quoting *In re SmarTalk Teleservices Sec. Litig.*, 124 F. Supp. 2d 505, 515 (S.D. Ohio 2000)).

The Sixth Circuit has narrowly defined the types of conduct that will meet this exacting recklessness standard for claims against an outside auditor:

> A complaint alleging accounting irregularities fails to raise a strong inference of scienter if it alleges no facts to show that the defendants know or could have known of the errors, or that their regular procedures should have alerted them to the errors sooner than they actually did. General allegations regarding an auditor's access to information do not raise an inference of fraud. We have also held that a failure to follow Generally Accepted Accounting Principles is, by itself, insufficient to establish scienter for a securities fraud claim. Improper accounting alone does not establish scienter whereby mere allegations that statements in one report should have been made in an earlier report do not make out a claim of securities fraud.

*Ernst & Young*, 622 F.3d at 481 (internal quotations, citations, and brackets omitted); *see also PR Diamonds*, 364 F.3d at 684.

Within the Sixth Circuit, the scienter test is subject to a "'totality of the circumstances test,' whereby the alleged facts collectively must give rise to a strong inference of actual knowledge or recklessness." *Ernst & Young*, 622 F.3d at 479 (quoting *PR Diamonds*, 364 F.3d at 683). The court must consider the complaint in its entirety. *Ernst & Young*, 622 F.3d at 485.

The well-pleaded facts must give rise not merely to an inference of scienter, but to a *strong* inference of scienter. The court must take into account plausible opposing inferences. The district court must conduct a comparative inquiry and assess the possible competing inferences that could be drawn from the allegations, including plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. A complaint will survive a motion to dismiss only if a reasonable person would deem the inference of scienter cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged. When two equally competing inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs* instructs that the complaint should be permitted to move forward.

*Id.* at 479 (emphasis in original) (internal citations, quotations, and brackets omitted).[8]

Furthermore, the Sixth Circuit has taken a dim view of claims against outside auditors premised on the auditor's failure to respond to purported "red flags" that a plaintiff alleges "should have triggered a higher degree of scrutiny." *See id.* at 482.

[F]or a red flag to create a strong inference of scienter in securities fraud claims against an outside auditor, it must consist of an egregious refusal to see the obvious, or to investigate the doubtful. Courts typically look for multiple, obvious red flags before drawing an inference that a defendant acted intentionally or recklessly. Mere allegations that an accountant negligently failed to closely review files or follow Generally Accepted Accounting Auditing Standards *cannot raise a strong inference of scienter.*

*Id.* (emphasis added) (internal quotations, citations, and brackets omitted); *accord Ley* 543 F.3d at 816-17 (rejecting "another attempt to couch alleged GAAS violations as evidence of scienter"); *PR Diamonds, Inc.*, 364 F.3d at 684 ("While the allegations no doubt merit drawing *some* inference of

---

8        Before *Tellabs*, a strong inference of scienter had to be the "most plausible" inference to draw from the alleged facts; however, after *Tellabs*, a strong inference of scienter has to be "at least as plausible" as a non-culpable inference. In certain passages in Kraft's brief, Kraft appears to misconstrue the applicable standard. For example, on page 18, it states, "while the standard for review dictates that an equally plausible non-culpable explanation is not actionable, it is quite frankly implausible to suggest that the findings that led to an increase in ALLL in the Fall of 2011 can provide the basis for a claim that Kraft fraudulently failed to force an increase in the ALL for the year-end 2010." The first clause is incorrect: if strong inference of scienter and a non-culpable explanation are equally plausible, the claim *is* actionable.

scienter, that is not enough. The PSLRA requires the Complaint to establish a *strong* inference [of scienter] . . . .") (emphases in original).

II.    GAAS

Plaintiffs allege that Kraft violated Generally Accepted Auditing Standards ("GAAS") with respect to certain audit letters related to TNCC's financial statements.[9] Plaintiffs contend that, under GAAS, Kraft was obligated to do the following:

- Understand the Bank and its environment, including internal controls, and obtain specific knowledge of the Bank's risk management strategies, organizational structure, and business strategies. AU § 311.06-.09; AAG Chapter 5.

- Assess internal controls processes, including inspecting loan documents to determine whether the Bank's lending policies were being followed. AU § 319; AAG, Chapter 8.

- Perform analytical procedures to substantiate that the financial statements produced by the Bank were free of material misstatement, including an analytical review of accounts that were vulnerable in light of the Bank's lax lending standards. AU § 329.

- Apply auditing procedures to accounts with a high risk of misstatement, including accounts related to ALLL. AU § 342.

- Assess the Bank's calculation of ALLL, including testing the relability of its representations related to ALLL. AU §§ 333 and 342.

---

[9]    Under the Sarbanes-Oxley Act of 2002, the Public Company Accounting Oversight Board ("PCAOB") develops auditing and professional standards to be followed by registered public accounting firms. The Auditing Standards Board ("ASB") of the American Institute of Certified Public Accountants ("AICPA") has set out "Generally Accepted Auditing Standards" ("GAAS"). During the Class Period at issue, the PCAOB had adopted the ASB's GAAS. GAAS includes Statements on Auditing Standards ("SAS"), which are codified in the AICPA Professional Standards under the prefix "AU", and auditing standards issued by the PCAOB under the prefix "AS." GAAS also includes the AICPA Audit & Accounting Guide ("AAG") for depository and lending institutions.

- Increase the nature, timing, and extent of auditing procedures applied when a high risk of fraud or error was present. AU § 316.

Plaintiffs also contend that Kraft failed follow GAAS factors related to identifying the risk of fraud and misstatement, including the following provisions:

- AU § 316.54, which advises that accounting estimates present a high degree of risk of fraud or misstatement.

- AU § 316.85, which states that risk factors for financial fraud include (1) a company's threatened financial stability from negative cash flows, and (2) ineffective monitoring of management because of an ineffective board of directors or ineffective audit committee oversight of internal controls.

- AU § 230.07, which requires auditors to exercise professional skepticism.

- AAG-DEP 5.128, pp. 118-119, which states that audit risk factors include: (1) "[l]ack of an appropriate system of authorization and approval of transactions in areas such as lending and investment, in which the policies and procedures for the authorization of transactions are not established at the appropriate level; and inadequate controls over transaction recording, including the setup of loans on systems," (2) "[r]elaxation of lending standards," "[e]xcessive extension of credit standards with approved deviation from policy," "[e]xcessive concentration of lending", and "[e]xcessive lending in new products"; (3) "[s]ignificant related entity transactions not in the ordinary course of business, including "[l]oans and other transactions with directors, officers, . . . and other related parties, particularly those involving favorable terms."; and (4) "Rapid growth or unusual profitability, especially compared to that of other peer financial institutions; for example, unusually large growth in the loan portfolio without a commensurate increase in the size of the allowance for loans and lease losses."

- AU § 330, which advises that the greater the level of assessed risk, the more assurance the auditor should gather to reach a conclusion about the associated financial statements.

As Plaintiffs acknowledge, many of the auditing requirements *did not apply* to Kraft's 2009 and 2010 audits, wherein Kraft conducted only financial statement audits, not complete audits. With respect to financial statement audits, the plaintiffs contend that Kraft was at least bound by AU § 325, which states in most relevant part as follows:

The auditor must communicate in writing to management and the audit all significant deficiencies and material weaknesses identified during the audit. . . . If oversight of the company's external financial reporting and internal control by the company's audit committee is ineffective, that circumstance should be regarded as indicator that a material weakness in internal control over financial reporting exists. Although there is not an explicit requirement to evaluate the effectiveness of the audit committee's oversight in audit of only the financial statements, if the auditor becomes aware that the oversight of the company's external financial reporting and internal control over financial reporting by the company's audit committee is ineffective, the auditor must communicate that information in writing to the board of directors.

AU § 325.

III.    Application

As discussed above, within the Sixth Circuit, pleading a viable securities fraud claim against an outside auditor is a daunting task, particularly based on a "red flags" theory of recklessness. As explained herein, Plaintiffs have not satisfied their burden and the claims against Kraft will be dismissed.

A.    Preliminary Points

Kraft argues that Plaintiffs' reliance on statements in the Material Loss Review is insufficient as a matter of law to establish scienter. First, the two referenced out-of-circuit cases do not support the proposition that reliance on a material loss review is necessarily insufficient as a matter of law; indeed, the court's discussion of scienter in each of those two cases turned on the specifics of the statements in each material loss review as they related to particular defendants, not on the grounds that a material loss review cannot, in general, support a securities fraud claim. *See In re Franklin Bank Corp. Sec. Lit.*, 782 F. Supp. 2d 364, 394 (S.D. Tex. 2011); *Cho v. UCBH Holdings*, 2011 WL 3809903 (N.D. Cal. May 17, 2011). The Court's analysis here proceeds along similar, unremarkable grounds: the Court evaluates the relevance of particular events set forth in the MLR, at least to the

extent those events reflect facts that were contemporaneously communicated to (or directly involved) TNCC and the Bank.[10]  Regardless Plaintiffs rely on considerably more documents than the MLR in an attempt to establish scienter here.

Kraft also contends that the MLR did not conclude that fraud was committed or that anyone (TNCC or its external auditors) had made material statements.  The Court agrees that the MLR does not contain any reference to potential fraud or misstatements by Kraft, at least.  However, as to TNCC, the Bank, and the Individual Defendants, it is a closer question as to what inferences (if any) reasonably may be drawn from statements in the MLR.  Because the Court need not reach that question as it relates to those settling Defendants, the Court expresses no opinion about the MLR as it relates to allegations of fraud against those Defendants.

Finally, Kraft argues that misstatement of the ALLL cannot support a fraud claim because it is an opinion about future events that falls within the "safe harbor" for "forward-looking statements" set forth in 15 U.S.C. § 78u-5(c)(1).  In response, Plaintiffs contend that (1) the ALLL is not a "forward-looking statement" within the meaning of the PSLRA's safe harbor provision, (2) even if the ALLL is a forward-looking statement, the safe harbor provision does not protect a company that makes a knowingly false statement of the ALLL, where a company deliberately or recklessly misstates or omits contemporaneous facts that render the ALLL representation to be false; and (3) the safe harbor provision does not apply to financial statements purportedly made in conformance with GAAP.

---

[10]     Plaintiffs have identified numerous cases in which courts have considered statements in a MLR.  (*See* Docket No. 75 at pp. 30-33.)  The Court incorporates those cases by reference herein.

As to the third of these arguments: Section 78u-5(c)(1) provides that, "[e]xcept as provided in subsection (b) of this section," a securities fraud claim will not lie if a forward-looking statement is either (1) identified as forward-looking and accompanied by meaningful cautionary statements, or (2) immaterial. However, subsection (b) states that the safe harbor provisions do not apply to "a forward-looking statement . . . that is . . . included in a financial statement prepared in accordance with generally accepted accounting principles."

Here, TNCC specifically represented in the 10-K disclosures at issue that the ALLL was presented in conformance with GAAP. Thus, even assuming *arguendo* that the ALLL is a forward-looking statement, TNCC's representations in their 10-K financial statements categorically exempt those statements from the PSLRA's safe harbor provision.[11] *See* 15 U.S.C. § 78u-5(b)(2)(A); *see In re Champion Enters. Inc., Sec. Litig.*, 144 F. Supp. 2d 848, 868 (E.D. Mich. 2001) (safe harbor does not apply to financial statements within Form 10-K); *In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 416 (D.N.J. 2004) (finding that statements in SEC filings prepared in accordance with GAAP did not fall within safe harbor); *Skubella v. Checkfree Corp.*, 2008 WL 1902118, at *7 (N.D. Ga. Apr. 25, 2008) (finding that quarterly financial report purportedly prepared in accordance with GAAP "cannot be protected by the safe harbor"); *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1007 (N.D. Cal. 2008) (finding that safe harbor did not apply to challenged statement in Forms 8-K

---

[11] After Kraft argued in its opening brief that the safe harbor provision in subsection (c) applies, Plaintiffs in their opposition asserted that subsection (b) expressly exempts TNCC's alleged material misstatements concerning ALLL from the safe harbor provision. Kraft did not file a Reply, meaning that, relative to Kraft, Plaintiffs' argument is effectively unrebutted. Even to the extent the Court may, in connection with Kraft's Motion, consider the reply briefs filed by the Individual Defendants relative to their own joint Motion to Dismiss, it does not appear that any Individual Defendant meaningfully addressed Plaintiffs' argument concerning the effect of subsection (b) either.

and 10-K filed with the SEC). Because the safe harbor conclusively does not apply to the representations about ALLL in the 10-K's at issue here, the Court will not address Plaintiffs' alternative arguments as to why the safe harbor should not apply, and the Court accordingly expresses no opinion as to whether the ALLL is a "forward-looking statement" for safe harbor purposes.

### B. Red Flags Analysis

Having cleared the brush, the remaining question is whether Plaintiffs have adequately pleaded facts supporting the requisite degree of scienter to support a securities fraud claim against Kraft. Although Plaintiffs' SAC and brief in opposition to the Motion to Dismiss list a hodge-podge of alleged "red flags" spanning the period from 2007 to 2011, Plaintiffs do not identify precisely when they believe Kraft first acted recklessly by failing to heed these alleged indicia of fraud. At any rate, Plaintiffs' best argument relates to Kraft's issuance of a (revised) unqualified audit letter in June 2011 relating to the TNCC's 2010 financial statement. Indeed, Plaintiffs laud Kraft for initially issuing a qualified audit statement in April 2011 with respect to TNCC's 2010 Form 10-K, but fault Kraft for issuing an unqualified audit statement concerning those financials in June 1, 2011, when Kraft represented (as did TNCC) that the Consent Order "ended" any concerns related to the Bank's 2010 ALLL estimate.[12] Plaintiffs contend that, at least by that point, Kraft was choosing to

---

[12]      In their opposition brief, Plaintiffs state that, in "April [2011], Kraft *took the very reasonable step* of refusing to issue an unqualified audit opinion on TNCC's fiscal year 2010 financial results, due to the possibility that the ALLL would be restated." (Docket No. 74. at pp. 73-74 (emphasis added).) According to Plaintiffs, Kraft's subsequent issuance of the unqualified letter on June 1, 2011 constituted a "stunning about-face" in the face of an "enormous risk of fraud" in TNCC's financial statements. (*Id.* at p. 74.)

ignore serious of indications of fraud, which should have caused Kraft to withdraw or qualify its 2009 and 2010 audit opinions.

First, Plaintiffs contend that Kraft committed numerous GAAS violations, including a reckless failure to probe the accuracy of the company's methodology supporting the ALLL. Although Plaintiffs reference numerous potential failures by Kraft to perform a sufficiently thorough audit of the Bank's finances under traditional GAAS principles, the fact is that Kraft expressly performed only *a financial statement audit*, not a complete audit, in connection with the 2009 and 2010 financial statements. Kraft's 2009 and 2010 audit letters explicitly disclosed that its role was limited, that it was relying on management's representations concerning internal controls, and that Kraft therefore expressed no opinion concerning the adequacy of those controls. Indeed, in a different section of the Form 10-K, TNCC represented that the company had vetted its own internal controls, that the controls were adequate, and that it had not asked its outside auditor to vet those controls.

Given Kraft's limited engagement by TNCC relative to the 2009 and 2010 financial statements, it would be unreasonable to infer that Kraft had access to or should have reviewed TNCC's records relating to internal controls, let alone that Kraft, during its audit, deliberately or recklessly ignored "obvious" or "egregious" signs that the internal controls were inadequate.[13] Because Kraft performed the tasks it was asked to perform, disclosed the limitations on its analysis, and expressly disclaimed any opinion concerning the internal controls that it was not asked to probe,

---

[13]     Indeed, TNCC management formally represented that its methodology and figures were accurate and steadfastly defended its methodology until the FDIC ordered it to restate the ALLL in September 2011 – well after Kraft had issued its June 1, 2011 unqualified audit letter concerning TNCC's 2010 financial statement.

it would not be reasonable to find that Kraft violated GAAS principles that fell outside the limited scope of its financial statement audit. If anything, the facts indicate that Kraft did not "recklessly" ignore any indications of fraud in its 2009 and 2010 financial statement audits: instead, the facts strongly suggest TNCC, by limiting Kraft's role to a financial statement audit, may have intentionally screened off Kraft from discovering issues concerning the ALLL in the first place. Plaintiffs are essentially left with an alleged failure by Kraft to communicate to management "all significant deficiencies and material weaknesses identified during the audit." *See* AU 325. But Plaintiffs do not allege that Kraft actually discovered any significant deficiencies or material weaknesses through its financial statement audits, thereby providing no basis to believe that Kraft had violated AU 325 in the first place.

Plaintiffs also point to numerous other alleged "red flags," including (1) Fort's lawsuit against the Bank, (2) the FDIC investigations of the Bank, which reported various forms of potential impropriety (generally of increasing severity) from 2007 through the Bank's failure in January 2012, including allegations relating to the lack of internal controls, (3) the Bank's flawed business model, which involved issuing increasingly more risky loans, (4) the FDIC's announcement in March 2011 that it intended to pursue formal enforcement action, including a potential reduction to the 2010 ALLL, and (5) the agreement to the Consent Order in May 2011, which included a requirement that the Bank accurately state its ALLL going forward.

With respect to Fort's lawsuit, the case was settled and voluntarily dismissed in October 2010 without any merits rulings by the district court. In the absence of any adverse findings against TNCC, there was no reason to believe that Fort's allegations were true. Moreover, after the FDIC

investigated Fort's allegations, the FDIC took no action. Thus, the fact of Fort's allegations did not a constitute an "obvious" indication of financial fraud at TNCC, at least relative to Kraft.

As to the remaining "red flags", which make more sense when construed collectively and in context, the facts do not support a "strong inference" that Kraft ignored such obvious indications of financial fraud as to be essentially complicit in TNCC's alleged fraud. Certainly, the FDIC identified concerns with respect to TNCC's business model and its calculation of the ALLL. In particular, in March 2011, it informed TNCC that the ALLL likely needed to be adjusted by about $16 million and that it would likely seek to require TNCC to conform its ALLL methodology with FAS 5 and FAS 114 going forward. One week later, the Board responded by vigorously disputing the FDIC findings concerning TNCC's ALLL. When Kraft issued its qualified audit letter one month later, it appropriately disclosed that, even subject to its limited engagement to conduct a financial statement audit, it could not represent that the ALLL was accurate in light of the FDIC's recent report, the implications of which Kraft appropriately stated were "unresolved."

For whatever reason, in the Consent Order that the Board signed on May 25, 2011, the FDIC relented on its earlier recommendation of an adjustment to the 2010 ALLL, and instead chose only to require TNCC to ensure that ALLL was calculated in accordance with FAS 5 and FAS 114 *going forward*. Although Plaintiffs here suggest that Kraft should have construed that prospective recommendation as indicating that TNCC had committed fraud with respect to the 2010 ALLL, the Court finds no reason why Kraft should have drawn that conclusion. The language talks about the future, not the past.

Furthermore, given the sequence of events, one could understand why Kraft would have construed the Consent Order's silence concerning TNCC's previous statement of ALLL as an

implicit indication that the regulators did not believe that a past adjustment was required. In its response to the FDIC and in its April 2011 public filings concerning the 2010 financials, TNCC had repeatedly stated that it disagreed with the FDIC's March 2011 report of examination, that it believed that TNCC's methodologies and financial statements (including its calculation of the ALLL) were accurate and intended to "vigorously appeal" that FDIC's findings. The FDIC had discretion to implement the remedies that it believed were justified and necessary, including ordering adjustments to the 2010 ALLL (or earlier periods). The FDIC also investigated TNCC multiple times and engaged in a dialogue with TNCC about what to do next. Nevertheless, it declined to order any previous adjustments to the ALLL in the May 2011 Consent Order. Under the circumstances, the terms of the Consent Order did not constitute an "obvious" red flag to Kraft of previous financial fraud by TNCC with respect to the ALLL. Indeed, to the contrary, Kraft plausibly could have construed it as reflecting the regulators' satisfaction with the previous statement of the ALLL. At any rate, even if Kraft took a relatively generous view of the Consent Order as "ending" the "period of uncertainty" relative to the 2010 ALLL, the terms of the Consent Order were made public on the same day as Kraft's revised unqualified letter, and Kraft expressly stated (again) that it had not been engaged to investigate, and therefore expressed no opinion concerning, the adequacy of the company's internal controls over financial reporting. Kraft disclosed the extent of, and limitations on, its knowledge of TNCC's financials, and none of these circumstances suggests any type of cover-up, "willful blindness," or a reckless refusal by Kraft to probe obvious indications of fraud.

The record also suggests that Kraft acted appropriately when the regulators determined, in late 2010, that immediate adjustment to ALLL was required. Kraft withdrew its 2010 audit letter and indicated that it might also withdraw previous audit letters. Kraft also raises the valid point that,

in the absence of more information, it is plausible that the loans subject to the $83 million adjustment in Fall 2011 were not among the loans addressed in the 2010 statement of ALLL. Indeed, Plaintiffs allege that TNCC continued to engage in a loaning spree in 2011 (*i.e.*, after the 2010 fiscal year) and restructured a number of loans in the Summer of 2011, which could have been the loans for which the adjustment was required.

More broadly, Plaintiffs have not pleaded any particular conduct or motivation by Kraft that would support an inference of scienter. Plaintiffs do not allege that Kraft had any specialized access to TNCC's or the Bank's financial records (particularly in 2009 and 2010), that Kraft actually knew of impropriety and chose to ignore it, or that Kraft had any particularized knowledge about the Bank's operations beyond its basic obligations as an external auditor. Perhaps most importantly, Plaintiffs do not allege why Kraft allegedly would have acted with such recklessness that it effectively assisted TNCC and its officers in engaging in securities fraud. The absence of particularized factors weighs against a strong inference of scienter.

On the other hand, Plaintiffs do have a point that several GAAS "risk factors" for fraud were present as of June 2011. Plaintiffs' allegations establish that, in hindsight, the Board did not have effective audit committee oversight over the Bank's internal controls (AU § 316.85), and that the Bank may have utilized relaxed lending procedures, made related-entity transactions, experienced rapid growth compared to its peers, and experienced unusually large growth of its loan portfolio without a commensurate increase in the size of the allowance for loan and lease losses (AAG-DEP 51.128 at pp. 118-119) – all of which are risk factors fraud. Again, given the limited scope of Kraft's 2009 and 2010 financial statement audits, it is not clear that Kraft would or should have known about the Bank's internal controls. At any rate, at most, a reasonable person could infer from

these allegations that Kraft should have exercised more professional skepticism before issuing a unqualified audit letter on June 1, 2011 relative to the 2010 10-K, and perhaps never should have issued an unqualified audit letter without actually testing the Bank's internal controls. Again, however, violations of GAAS alone are insufficient to establish the requisite degree of scienter.

Taken cumulatively, the allegations against Kraft could, at most, support a claim that Kraft acted negligently. However, the allegations do not meet the exceedingly high standard of "recklessness" applicable to claims against an outside auditor, because they fail to support a "strong inference" of scienter by Kraft. Thus, a reasonable person would not "deem the inference of scienter cogent" in the first place. *See Ernst & Young*, 622 F.3d at 479.

Furthermore, even if a reasonable person could draw a "strong inference" of scienter from the facts at issue, that inference as not as compelling as non-culpable explanations for Kraft's conduct. The record does support an inference that TNCC limited Kraft's role with respect to the 2009 and 2010 financial statements, perhaps in an effort to *prevent* Kraft from uncovering evidence of fraud. Furthermore, Kraft appears to have drawn reasonable inferences from management's express representations and from the recommendations of the regulators concerning TNCC's 2010 ALLL, under circumstances in which the regulators may have had more access to the underlying methodologies than Kraft. The inference that Kraft so "egregiously" refused to "see the obvious" or "investigate the doubtful" is not as compelling as the inference that Kraft acted innocently, or at worst negligently, in issuing an unqualified audit letter in June 2011.

This case involves circumstances even less compelling than those presented in several Sixth Circuit cases affirming the dismissal of claims against an outside auditor. In *Fidel v. Farley*, for example, the plaintiffs claimed that Fruit of the Loom's external auditor, Ernst & Young, should be

held liable for securities fraud for providing unqualified audit statements despite numerous "red flags."  392 F.3d at 228.  The plaintiff alleged that: (1) the auditor knew that a securities fraud lawsuit had been filed against the company; (2) the auditor had first-hand knowledge of the company's "demonstrated propensity to skirt the financial rules"; (3) the auditor received an anonymous letter detailing certain financial misstatements occurring within the company; (4) the auditor knew that the company was extending unusual rights to its customers; and (5) the company's management "demonstrated numerous risk factors," including "an excessive interest by management in maintaining or increasing" the company's stock price or earnings trend through use of unusually aggressive accounting practices.  *Id.* at 228-29.  Notwithstanding these significant indications of potential fraud, the Sixth Circuit affirmed the district court's holding that the allegations were insufficient to establish the requisite degree of scienter.  *Id.* at 229-230.  Indeed, the Sixth Circuit concluded that "[t]hese red flags simply do not create the inference, much less a strong inference, that Ernst & Young, in preparing an audit report of 1998 financial results, acted with scienter."  *Id.* at 229.

Similarly, in *PR Diamonds*, the Sixth Circuit found that the following alleged circumstances did not support a finding of scienter against the external auditor: (1) the client committed significant GAAP violations; (2) the auditor was aware of, but ignored, numerous internal control deficiencies by the client; (3) the accounting violations were simple, obvious, and involved large-scale fraud; (4) the auditor had unfettered access to the company's confidential information throughout the class period; and (5) the auditor was warned that the accounts receivable reserve was understated.  364 F.3d at 693-96.

In *Ernst & Young*, the circumstances were even more serious.  There, the plaintiffs alleged that the outside auditor was aware of numerous red flags: (1) the financial statements at issue reflected numerous GAAP violations; (2) the auditor knew but ignored the fact that management altered certain numbers; (3) the auditor knew that the company had a history of serious accounts receivable collection problems; (4) the auditor knew or should have known that a material portion of the accounts receivable was uncollectible; and (5) the company had sued the auditor because the lead auditor had admitted to the company that "there was a problem." 622 F.3d at 474-476, 481-484. Applying the stringent pleading standard, the Sixth Circuit affirmed the district court's conclusion that these allegations were not sufficiently specific to raise a strong inference of scienter relative to the external auditor.  *Id.* at 483.

Here, the circumstances are even less compelling than those at issue in *Fidel*, *PR Diamonds*, and *Ernst & Young*.  Therefore, Plaintiffs' claim against Kraft will be dismissed with prejudice for failure to support the requisite degree of scienter.  Because the Court finds that dismissal is appropriate on this basis alone, the Court need not address Kraft's argument that Plaintiffs have failed to prove loss causation.

## CONCLUSION

For the reasons stated herein, Kraft's Motion to Dismiss is granted and Plaintiffs' claim against Kraft is dismissed with prejudice.

IT IS SO ORDERED.

TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE